IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

FREEPLAY MUSIC, LLC,

      Plaintiff,

    v.

DAVE ARBOGAST BUICK-GMC,
INC.,

      Defendant.

:

:

:

Case No. 3:17-cv-42

JUDGE WALTER H. RICE

---

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OR FOR REFERRAL OF ISSUES TO
REGISTER OF COPYRIGHTS (DOC. #52); SUSTAINING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ON LIABILITY FOR
COPYRIGHT INFRINGEMENT (DOC. #53); PARTIES TO FILE JOINT
AMENDED RULE 26(f) REPORT BY OCTOBER 23, 2019;
SCHEDULING CONFERENCE SET FOR OCTOBER 30, 2019

---

Plaintiff Freeplay Music, LLC ("FPM") filed suit against Dave Arbogast Buick-GMC, Inc. ("Arbogast") alleging 279 instances of copyright infringement under 17 U.S.C. § 501. This matter is currently before the Court on Defendant's Motion for Summary Judgment or for Referral of Issues to Register of Copyrights, Doc. #52, and on Plaintiff's Motion for Summary Judgment on Liability for Copyright Infringement, Doc. #53.

I.      Background and Procedural History

As part of its advertising strategy, Dave Arbogast Buick-GMC, Inc. ("Arbogast") promotes the sale of its automobiles via YouTube videos. According to General Manager, Blake Arbogast, early in 2013, he instructed his interns to search the Internet for sources of free music that could be used in those videos. The interns found the website freeplaymusic.com, which is owned and operated by Plaintiff Freeplay Music, LLC. Doc. #52-1, PageID##894-95. An Arbogast employee, David Novotny, who was responsible for developing the advertisements, accessed the website and downloaded music to a folder by right-clicking his selections. He does not recall seeing anything about restrictions for business use, or the need for a license. Novotny first uploaded the music to his videos in early 2014. Doc. #52-2, PageID##909-10.

In July of 2014, Darrin Michael, Arbogast's e-commerce Director, told Blake Arbogast that some of the videos had been "flagged for copyright [infringement] because of the music." Michael began removing the infringing audio from the inventory videos. By July 11, 2014, Blake Arbogast believed that all of the allegedly infringing music had been removed from the YouTube videos. Doc. #52-1, PageID##895, 898. He was incorrect in this assessment.

On October 21, 2014, Arbogast received an email message from TuneSat, LLC, a company acting on behalf of Freeplay Music, LLC. The message stated that it had identified FPM's copyrighted music being used in Arbogast's YouTube videos. TuneSat demanded that Arbogast cease and desist all unauthorized use of

2

FPM's copyrighted music and provide a list of all suspected unauthorized uses. TuneSat indicated that, absent proof of a valid license, it would be forced to treat the matter as a copyright infringement. It indicated, however, that it would be open to structuring a settlement agreement to cover all of the unauthorized uses. Doc. #52-1, PageID#901.

Jordan Davis of TuneSat spoke to Arbogast's Darrin Michael on October 29, 2014. In a follow-up email, Davis attached screenshots of FPM's home page as it appeared in 2012. Doc. #52-1, PageID#904. The home page included the following statement: "To learn how you can use Freeplay music click on Terms of Use, Licensing, Rate Card." Doc. #52-2, PageID#912. It appears that Michael agreed that Arbogast had probably never purchased a license for the music; he was, however, going to confirm that. Davis attached a list of the alleged infringements and offered to settle the matter for $750,000. Doc. #52-1, PageID#904. Arbogast refused.

On February 9, 2017, FPM filed suit against Arbogast, alleging 279 instances of copyright infringement, involving 23 of FPM's copyrighted sound recordings and compositions. Doc. #1. In a Motion for Judgment on the Pleadings, Doc. #17, Arbogast challenged FPM's ownership of the copyrights at issue. The parties conducted limited discovery on this issue. On June 1, 2018, the Court overruled Arbogast's motion as moot and stayed the case pending mediation. Doc. #50. All attempts at mediation have failed.

The parties have now filed cross-motions for summary judgment. FPM seeks summary judgment on the issue of Arbogast's liability for copyright infringement. Doc. #53. Arbogast also seeks summary judgment on all claims. In the alternative, Arbogast asks the Court to refer the case to the Register of Copyrights for a determination of whether inaccurate information included on the copyright registrations, if known, would have caused the Register to refuse the registrations. Doc. #52.

## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing

4

summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings and present some type of evidentiary material in support of its position." *Celotex*, 477 U.S. at 324. The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff. *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

5

*Snap-On Bus. Sols. Inc. v. O'Neil & Assocs. Inc.*, 708 F. Supp. 2d 669, 676 (N.D. Ohio 2010).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits." *Id.* (citations omitted).

## III.    Analysis

In order to succeed on its claim of copyright infringement, FPM must prove that: (A) it is the owner of the copyrights at issue; and (B) Arbogast copied, recorded, adapted, or published the copyrighted works without authorization to do

so. *Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.,* 58 F.3d 1093, 1095 (6th Cir. 1995).

## A. Copyright Ownership

Both the Plaintiff and Defendant filed motions for summary judgment on the issue of copyright ownership. FPM maintains that there is no issue of material fact on the element of copyright ownership. FPM produced certifications of registration for all 23 musical works involved in this action.[1] Arbogast, however, argues it is entitled to summary judgment because FPM cannot establish copyright ownership for all of the copyright registrations. As an alternative to summary judgment, Arbogast requests that the case be referred to the Copyright Office for determination of validity for the registration certifications FPM produced.

A copyright registration is a prerequisite to filing a civil action for copyright infringement. 17 U.S.C. § 411(a). "A certificate of copyright registration constitutes 'prima facie evidence of the validity of the copyright and of the facts stated in the certificate.'" *Jedson Eng'g, Inc. v. Spirit Constr. Servs., Inc.*, 720 F. Supp. 2d 904, 913 (S.D. Ohio 2010) (quoting 17 U.S.C. § 410(c)). The presumption of validity may be rebutted, but the party challenging the presumption of copyright ownership bears a "heavy burden." *Jedson Eng'g, Inc.,* 720 F. Supp. 2d at 913.

---

[1] *See generally* Doc. #19-2; Doc. #19-3; Doc. #19-4; Doc. #19-5; Doc. #53-15; Doc. #53-18; Doc. #53-20; Doc. #53-22; Doc. #53-26; Doc. #53-31.

If the challenging party proves that the copyright holder committed fraud in the application for the copyright, the presumption of validity will be rebutted. *Lennon v. Seaman,* 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000). However, the party asserting fraud must establish that the application for the copyright is: (1) factually inaccurate; (2) the inaccuracies were willful or deliberate; and (3) the Copyright Office relied on those misrepresentations. *Id.* The party challenging the presumption of ownership must present more than a conjecture to rebut the presumption of validity. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns., Inc.,* 149 F. Supp. 3d 634, 645 (E.D. Va. 2015), *aff'd in part, rev'd in part,* 881 F.3d 293 (4th Cir. 2018); 3 Nimmer on Copyright § 12.11 n.28.18 (2019).

Ownership of a copyright can arise through authorship or assignment. *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1097 (N.D. Cal. 2002). A third party generally does not have standing to challenge the presumption of ownership established by a valid assignment if there is no dispute between the assignee and assignor. *Id.* at 1097-1099. However, third parties may challenge the validity of ownership by authorship, including "work-for-hire" agreements. *Id.*

### 1. Assigned Works

In this case, FPM claims ownership over some of the musical works by assignment. These works include: (1) "Ground Squad"; (2) "Corn Liquor"; (3) "Driftwood"; (4) "Heartland"; (5) "Spice Factor"; and (6) "Through the Grassy Hills." This court previously determined that Arbogast lacks standing to challenge the ownership by assignment. Doc. #49, PageID#855. FPM and the assignors or

8

licensors agree that FPM is the rightful copyright owner.[2] Although Arbogast lacks standing to challenge the assignment of the copyrights to FPM, Arbogast may nevertheless challenge the presumption of validity of the copyright registrations by proving fraud on the Copyright Office. *See, e.g.*, *Shady Records, Inc. v. Source Enters.,* No. 1:03 Civ. 9944 (GEL), 2004 U.S. Dist. LEXIS 26143 (S.D.N.Y. Dec. 30, 2004). FPM will be entitled to summary judgment on the issue of copyright ownership for the six assigned works listed above unless Arbogast can prove fraud on the Copyright Office.

### 2. Work-for-Hire Agreements

A "work made for hire" is "a work prepared by an employee within the scope of his or her employment" or "a work specifically ordered or commissioned for use . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author." 17 U.S.C. § 201(b).

FPM has produced the work-for-hire agreements for the other seventeen songs in question.

--------

[2] Composer Rick DiFonzo provided in his declaration that FPM is the rightful owner to the copyright for "Corn Liquor," "Driftwood," "Heartland," and "Spice Factor" under an assignment between FPM and Cruz Bay Music. Doc. #45-1, PageID#807. Composer Tilmann Sillescu created "Ground Squad" for Dynamedion GbR which then assigned the rights and interest to FPM. Doc. #45-1, PageID#809. Composer Kelly Weeks stated that he or she granted FPM an exclusive license for "Through the Grassy Hills," and that FPM has owned the work since 2008. Doc. #45-1, PageID#823.

1)  "Can Do": Doc. #53-8; Doc. #53-9; Doc. #53-7
2)  "Swing Cheese": Doc. #53-8; Doc. #53-9; Doc. #53-7
3)  "Your Eyes on Glory": Doc. #53-8; Doc. #53-9; Doc. #53-7
4)  "Challenge The Dream": Doc. #53-11; Doc. #53-7
5)  "Cuttin Loose": Doc. #53-11; Doc. #53-7
6)  "Mod Indigo": Doc. #53-11; Doc. #53-7
7)  "Charlie": Doc. #53-12
8)  "Moonbeams": Doc. #53-15
9)  "The Edge": Doc. #53-15; Doc. #53-7
10) "Feel Good":  Doc. #53-17
11) "Funky Pad": Doc. #53-19
12) "Hear Me Calling": Doc. #53-23
13) "Right On It": Doc. #53-23
14) "Soul Thang": Doc. #53-24; Doc. #53-7
15)  "SurfNation": Doc. #53-25
16) "Tea For Two": Doc. #53-26; Doc. #53-7
17) "Up The Downbeat": Doc. #53-28; Doc. #53-29; Doc. #53-7

Each "work-for-hire" agreement contains a "belt and suspenders" clause,

providing that, if the work is deemed not to be a "work-for-hire," then the

composer assigns all right, title, and interest in the copyright to FPM. In addition, a

majority of the authors submitted declarations stating that FPM is the rightful

owner of the copyright.[3] FPM was not obligated to provide these documents, but

they evidence the validity of the work-for-hire agreements.

Arbogast maintains that FPM's ownership of the music in question is derived

from the claims that Scott Schreer, the founder and owner of FPM, contributed to

the creation of the songs. That claim is inaccurate. Instead, FPM both claims and

---

[3] Of the fifteen authors who assigned ownership of the music to FPM through a
work-for-hire agreement, eleven provided declarations confirming FPM's ownership
of the songs in question. Doc. ##46-1,2. Doc. #45-1. The ones that did not are
immaterial to the validity of the registration because this evidence is supportive but
unnecessary, especially in light of the "belt-and-suspenders" clause.

derives ownership of the copyrights of the songs in question either through assignment, or through work-for-hire agreements.

Arbogast also takes issue with Mr. Schreer's inability to identify the specific works or the specific contributions of the various authors to the works at issue in this case. Again, this concern is irrelevant. Being able to identify a particular musical work is not a prerequisite to establishing ownership for a copyright for that particular song. Moreover, as explained by FPM, this music is production music or "wallpaper" music that is designed to be heard, not remembered, and the music was created 15-20 years ago alongside thousands of other similar musical compositions. Doc. #66, PageID#2001.

Additionally, regardless of whether or not Schreer was a contributor, supervisor, or primary composer, FPM derives ownership to each song under either an assignment or a work-for-hire agreement. For the ten songs that Schreer allegedly contributed to, FPM has provided the work-for-hire agreements for everyone who contributed to the production, including Schreer. Moreover, none of the authors who assigned ownership to FPM are contesting FPM's ownership of the copyrights. Thus, Schreer's specific contributions or lack thereof are irrelevant to the issue of copyright ownership.

Since FPM has presented certificates of registration, FPM is entitled to a presumption of validity. FPM further supports its copyright ownership with the work-for-hire agreements and assignment agreements. Although the presumption of validity is rebuttable, Arbogast has not presented any evidence that would rebut

11

that presumption for the songs produced under work-for-hire agreements. Thus, FPM is entitled to summary judgment on the issue of copyright ownership for the songs produced under the work-for-hire agreements, unless Arbogast can prove fraud on the Copyright Office.

### 3. Timely Registration

Section 410(c) of Title 17 of the United States Code provides,

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c).

Absent evidence that the date of first publication listed on the certification or registration is incorrect, the certificate is prima facie evidence that the date of first publication listed is accurate. *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 227 (S.D.N.Y. 1988).

Arbogast argues that FPM is not entitled to the presumption of validity because FPM has no record of the first publication and Schreer did not recall the specific dates of first publication during his deposition. Arbogast demands either substantiation of the facts in the registration, or deposit copies of the works in question.[4]

---

[4] The deposit copy is simply an original or copy of the item the copyright holder intends to copyright. The deposit copy and application are reviewed by a registration specialist to ensure compliance with copyright application

Since FPM has provided the registration certificates, it is entitled to the presumption of validity, and that presumption covers not only the registration itself, but also the facts stated in the registration. The burden lies with the alleged infringer to present evidence that the copyright holder's registration is invalid, including the date of first publication. *Id.* Arbogast, however, has presented no evidence that Schreer or any of the other authors first published the works at some date different from what is listed with the Copyright Office. The fact that Schreer, at his deposition, could not recall the exact dates for the creation and publication of "background music" does not evidence falsity of the publication date. Since Arbogast has not presented evidence that would call into question the accuracy of the information included in the registration, FPM is entitled to a presumption of validity that extends to the date of first publication stated in the certificate of registration.

Arbogast's request for FPM to "genuinely substantiate" its registrations is improper. As stated above, the burden lies with the alleged infringer to present evidence that the copyright holder's registration is invalid. *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 477 (6th Cir. 2015). Requiring FPM to "genuinely substantiate" the facts in the copyright registrations would improperly shift the burden of proof to FPM. Citing *Corwin v. Quinonez*, 858 F. Supp. 2d 903, 913 (N.D. Ohio 2012), Arbogast argues that FPM should demonstrate ownership

---

requirements. U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 204.3 (3d ed. 2017).

by providing a song-by-song description of the works in question and their specific authorship. Arbogast's reliance on this case is improper. First, the copyright claimant in *Corwin* conceded the fact that the copyright registration was made outside the five-year period after first publication, so the presumption of validity did not apply and the burden shifted to the copyright claimant to produce evidence of ownership. *Id.* In this case, FPM has not conceded that the copyright registrations occurred more than five years after first publication, so the evidentiary burden continues to rest on Arbogast.

Additionally, Arbogast's request for the deposit copies of the works provided with the original copyright applications is improper. Arbogast argues that the failure to produce a deposit copy of the original registration either challenges the presumption of validity or overcomes the presumption in general. Although the deposit copy may be necessary in some cases, a deposit copy is unnecessary here. Arbogast cites *Corbis Corp. v. Amazon.com, Inc.,* where the court determined that production of the deposit copy was necessary to determine whether or not a certain photo in question was included under the registration number the Plaintiff provided. 351 F. Supp. 2d 1090, 1113-15 (W.D. Wash. 2004).

The facts of this case are easily distinguishable. In this case, the registrations clearly cover the works in question. With relative ease, each song or musical work to which FPM claims ownership can be traced back to a registration number provided by the Copyright Office. The deposit copy would add nothing to the analysis of the copyright ownership issue. Thus, the lack of deposit copy does

14

not overcome the presumption of validity of the copyright registration. Again, under 17 U.S.C. § 410(c), FPM is not required to do anything else to retain the presumption of validity covering both the registration and the date of first publication. Since Arbogast has not presented any evidence that the dates of first publication, as listed on the registrations, are incorrect, those dates are presumed valid.

Even if the copyright registration was not filed within the five-year window, the certificate is not rendered invalid. Rather, the copyright registration is no longer prima facie evidence of validity of the copyright and facts stated in the registration. Under 17 U.S.C. § 410(c), the court has discretion to accord whatever weight it feels to be appropriate to copyright registrations made outside the five-year registration period. In this case, FPM has provided enough evidence to prove ownership of the copyright irrespective of the five-year statutory presumption window. FPM has provided the work-for-hire agreements, assignment agreements, copyright registrations, and affidavits supporting its claims of ownership from a majority of the contributing artists. In the Court's view, there is no question that FPM owns copyrights for works at issue in this case. Unless Arbogast can demonstrate fraud on the Copyright Office, FPM will be entitled to summary judgment on the issue of copyright ownership for the seventeen work-for-hire musical works in addition to the six assigned ones.

### 4. Fraud on the Copyright Office

Arbogast alleges multiple theories of fraud on the Copyright Office. Proving fraud on the Copyright Office will successfully rebut the presumption of validity given to the copyright registrations. A party asserting fraud on the Copyright Office must establish that: (1) the application for the copyright is factually inaccurate; (2) the inaccuracies were willful or deliberate; and (3) the Copyright Office relied on those misrepresentations. *Jedson Eng'g, Inc.,* 720 F. Supp. 2d at 913-14 (internal quotations omitted). Clerical errors, innocent misstatements, and deliberate, but immaterial misstatements will not overcome the presumption of validity, unless the defendant can prove fraud or the intent to extend the statutory period of copyright protection. *Id.* Material misstatements in a copyright registration application "are those which go toward the registrability of the materials themselves, such as originality . . . the nature of materials to be copyrighted . . . and contested claims of authorship and ownership." *Id.* The presumption of validity will be rejected only where the facts shown might have occasioned rejection of the copyright application by the Copyright Office. *Id.* Again, the alleged infringer bears a heavy burden in attempting to prove fraud. *Id.* at 913.

FPM notes that fourteen of the songs were originally and improperly registered under the name "Freeplay Music, Inc.," a non-existent entity. Doc. #19, PageID#182. After it became aware of the errors, FPM notified the Copyright Office and filed supplemental registrations to correct the error, noting that, *at the time the registrations were filed*, the proper entity was "Freeplay Music, Corp." *Id.*

16

A representative of the Copyright Office emailed Scott Schreer to ensure that he was in fact the agent authorized to make this name change. Doc. #59-7, PageID##1915–1916. At that time, Schreer informed the Copyright Office that he was the duly authorized agent on behalf of FPM. He noted, however, that the company name was currently "Freeplay Music, LLC" and no longer "Corp." *Id.* The Copyright Office, on its own accord, corrected the supplemental registrations to reflect this. Docs. ##19-3, 19-4, 19-5.

Arbogast alleges that the company name change on the copyright registration forms from "Inc." to "Corp." to "LLC" was not simply a corrective measure taken by FPM and Schreer. Arbogast suggests that FPM made the company name change from "Inc." to "LLC" in order to preserve "then-pending shakedowns" in other copyright infringement cases initiated by FPM. Doc. #56, PageID#1806. According to Arbogast, the name change would therefore constitute fraud on the Copyright Office. Arbogast also takes issue with the supplemental registrations FPM submitted during prior infringement cases without giving the Copyright Office notice of pending litigation.

Arbogast's claim, that the name change from "Inc." to "Corp." then "LLC" was fraud and not a clerical correction, is unsupported by the facts. As noted by FPM, Freeplay, whether listed as "Inc.," "Corp.," or "LLC," has always been a Scott Schreer company at the address listed on the copyright registrations. Notably, eight of the copyright registrations in question were originally filed listing the *correct* entity "Freeplay Music, Corp." as the owner. This gives credence to

17

FPM's claim that the inaccurate company name, "Freeplay Music, Inc.," on some of the copyright registrations was a clerical error and not a willful or deliberate misstatement. All other contact information for the registering party was always accurate. This Court previously held that the inconsistencies, which FPM corrected with the supplemental applications prior to filing this lawsuit, are not material to the registerability of the works in question. Doc. #49, PageID#859. These clerical mistakes are immaterial because there are no issues regarding originality or copyrightability of the works in question and no co-authors or assignors are contesting ownership. Moreover, the Copyright Office likely would have rejected the applications if these errors were material.

Second, Arbogast's concern that the supplemental registrations were made without notifying the Copyright Office of then-pending litigation does not evidence fraud on the Copyright Office. Again, fraud on the Copyright Office requires fraudulent intent and material misstatements that call into question ownership, originality, or copyrightability of the songs in question. *Jedson Eng'g, Inc.,* 720 F. Supp. 2d at 913-14. The Copyright Compendium provides that when the Copyright Office is aware of actual or prospective litigation, the Office *may* decline to issue a supplementary registration if it seems likely that the proposed change would be *directly at issue in the litigation*. U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 1802.9(G) (3d ed. 2017).[5] However, a

---

[5] The example provided by the Compendium is as follows: "Michelle Peck registered an online video, naming herself as the author and copyright claimant.

supplemental registration may be granted during litigation if the change is a spelling mistake, clerical error, or change to the title of the work. *Id.* Neither the Copyright Compendium nor 17 U.S.C. § 410 imposes an express duty on the copyright holder to notify the Copyright Office of pending litigation when filing a supplemental registration.[6]

Arbogast's argument concerning the notice of pending litigation is unpersuasive for multiple reasons. First, this Court previously determined that the misstatements corrected by the supplemental registrations were immaterial. Doc. #49, PageID#859.The company's name change does not call into question the ownership, originality, or copyrightability of the songs in question. Since the misstatements are immaterial and would not warrant rejection of the registration by the Copyright Office, the presumption of validity stands.

---

Mark Ferrell subsequently registered the same video, naming himself as the author and copyright claimant. Michelle submits an application for a supplementary registration stating that Mark's name should be added to her registration as a co-author and co-claimant. In a cover letter, Michelle explains that the parties are involved in a lawsuit concerning the ownership of the copyright. The authorship and ownership of the work appear to be directly at issue in the litigation, and if the Office added Mark's name to the registration record for Michelle's registration it could upset the balance between the competing registrations. As a result, the Office may decline to issue a supplementary registration until the dispute has been resolved." U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 1802.9(G) (3d ed. 2017).

[6] The Copyright Office's policy statements, agency manuals, and enforcement guidelines do not carry "the force of law," but they are "entitled to some deference given the specialized experience and broader investigations and information of the agency." *Rogers v. Better Bus. Bureau of Metro. Houston, Inc.*, 887 F. Supp. 2d 722, 732 (S.D. Tex. 2012) (internal quotations omitted).

Next, FPM's company name change did not concern a material fact at issue in litigation. The Copyright Office likely would have approved the clerical name change with or without knowledge of any active litigation, because FPM has always been the copyright claimant at the address listed in the copyright registration. The name change was simply clerical. Unlike the example provided by the Copyright Compendium, there have been no competing claims for ownership or authorship regarding the music Arbogast used in its advertisements. Arbogast does not overcome the presumption of validity because nothing in the record would allow the fact-finder to infer that the supplemental registrations would have been rejected by the Copyright Office had it been informed of the active litigation at the time the supplemental registrations were made.

Additionally, the supplemental registrations were issued before discovery and were in fact located by Arbogast during discovery. The potential issues that are created when the copyright holder does not inform the Copyright Office of active litigation when filing a supplemental registration are not present in this case. Thus, the presumption of validity granted to the supplementary registrations stands.

Lastly, Arbogast also argues that the failure to include the names of the other musical authors on the application form for the various registrations would potentially constitute fraud on the Copyright Office. The Court disagrees.

In *Shady Records*, the Copyright Office granted a valid copyright registration knowing that the co-author was omitted from the application, despite

20

Copyright Office policy that asks for any co-authors to be listed in the application. *Shady Records*, 2004 U.S. Dist. LEXIS 26143, at *36. The court stated that "[I]f failure to include all co-authors were material to disposition of the registration, the Copyright Office would invalidate, rather than permit amplification of registrations suffering such omissions." *Id.*

Similarly, in this case, the Copyright Office granted FPM valid registrations and supplemental registrations knowing that the works were created under work-for-hire agreements and the names of the co-authors were omitted from the applications. If the Copyright Office found the omission of the co-authors from the applications to be a material mistake, it would not have issued the registrations or supplemental registrations.

Arbogast fails to carry the burden of proving fraud on the Copyright Office. Both arguments regarding the name change and the omission of co-authors are insufficient to prove fraud, because the arguments involve immaterial issues that would not affect the validity of the copyright registrations. Since Arbogast raises no arguments involving material issues, the presumption of validity of the copyright registration stands. Since the presumption of validity has not been rebutted by proof of fraud on the Copyright Office, FPM, upon a showing of actual infringement, is entitled to summary judgment on the issue of liability, unless there is a valid defense to enforcement.

### 5. Referral to the Copyright Office

As an alternative to summary judgment, Arbogast asks the Court to refer

this case to the Copyright Office under 17 U.S.C. § 411(b). The statute provides:

(1) A certificate of registration satisfies the requirements of this
section and section 412, regardless of whether the certificate
contains any inaccurate information, unless—

(A) the inaccurate information was included on the application
for copyright registration with knowledge that it was inaccurate; and

(B) the inaccuracy of the information, if known, would have
caused the Register of Copyrights to refuse registration.

(2) In any case in which inaccurate information described under
paragraph (1) is alleged, the court shall request the Register of
Copyrights to advise the court whether the inaccurate information, if
known, would have caused the Register of Copyrights to refuse
registration.

17 U.S.C. § 411(b).

Only two district court cases within the Sixth Circuit have addressed the

Copyright Office's referral standards. The court in *Schenck v. Orosz* recognized

that, although the statute seeks to eliminate guesswork by the federal courts as to

how the Copyright Office would respond, 411(b)(2) referral is subject to potential

abuse that would cause unnecessary delay in infringement claims. *Schenck v.*

*Orosz*, 105 F. Supp. 3d 812, 818 (M.D. Tenn. 2015). The court suggested that

referral to the Copyright Office should not be made when allegations are

unsupported by any facts in the record. *Id.* at 819. As a threshold question, the

*Schenck* court asks: (1) have the defendants adequately alleged a violation under

§411 (b)(1), and (2) are those allegations factually supported? *Id.*

22

In *Libertas Technologies v. Cherryhill Management,* the court refused to refer the case to the Copyright Office because the Copyright Office was already aware of, or would have recognized, the alleged defects and it chose to issue the registration anyway. *Libertas Techs. v. Cherryhill Mgmt.*, No. 1:10-cv-935, 2012 U.S. Dist. LEXIS 173078, at *35-36 (S.D. Ohio Dec. 6, 2012). Moreover, the Court found that other claimed defects in the registration were unsupported by the facts. *Id.*

In this case, Arbogast asks the Court to seek guidance from the Copyright Office on three questions:

1) Would the Copyright Office have refused the copyright registrations if it knew Freeplay Music, Inc. was non-existent?

2) Does the "Corp." to "LLC" name change invalidate the copyright registration because the "LLC" was not established until 2007?

3) Does the failure to include the other co-authors on the Form SR application invalidate the copyright registrations?

Doc. #52, PageID#888.

The facts in this case do not warrant referral to the Copyright Office to answer any of the three questions posed by Arbogast. The first question, regarding the non-existence of "Freeplay Music, Inc.," does not warrant referral to the Copyright Office, because the facts do not show that FPM included the inaccurate company name "with knowledge that it was inaccurate." 17 U.S.C.

23

§ 411(b)(1)(A). As previously discussed, the evidence supports a finding that this was nothing more than a clerical error. Similar to the issue in the *Libertas* case, the Copyright Office knew of the defects and allowed FPM to make supplemental registrations to fix the errors. The non-existence of "Freeplay Music, Inc." did *not* "[cause] the Register of Copyrights to refuse registration." 17 U.S.C. § 411 (b)(1)(B). The Copyright Office has already answered the first question Arbogast wishes to ask by accepting the supplemental registrations and recognizing FPM as the owner of the copyrights.

Similarly, the second question regarding the name change from "Corp." to "LLC" does not warrant referral to the copyright office. When the Copyright Office contacted Schreer to verify that he was authorized to change the name from "Freeplay Music, Inc." to "Freeplay Music, Corp." he informed them that, although at the time of the original registration, the owner should have been listed as "Freeplay Music, Corp.", the legal entity was now "Freeplay Music, LLC." Doc. #59-7, PageID##1915–1916. The Copyright Office updated the records accordingly. *Id*. The fact that "Freeplay Music, LLC" did not exist when the original registrations were filed does not invalidate the copyright registrations, as evidenced by the fact that the Copyright Office made the name change on its own accord.

Finally, much like the first two questions, the third question has also been indirectly answered by the Copyright Office. Although the failure to include any co-authors was likely made knowing the information was inaccurate, the inaccuracy

24

of the information would *not* have caused the Register of Copyrights to refuse registration. *See Shady Records,* 2004 U.S. Dist. LEXIS 26143, at *36.

In sum, each question Arbogast asks has already been answered by the Copyright Office by granting the copyright registrations for FPM and accepting the supplemental registrations. This Court need not engage in the type of guesswork §411(b) was intended to prevent. Referral to the Copyright Office would only unnecessarily delay this infringement action with no benefit. Thus, Arbogast's request to refer the case to the Copyright Office is denied.

### B. Unauthorized Use

The second prong necessary to establish a claim for copyright infringement requires FPM to prove that Arbogast reproduced or published the copyrighted material without authorization. *Hi-Tech Video Prods.,* 58 F.3d at 1095. It is undisputed that Arbogast used the copyrighted music in advertising videos. However, Arbogast argues that FPM granted either an express license or an implied license to use the copyrighted music.

#### 1. Express License and Browsewrap Agreement

Arbogast maintains that, based on the website design as it existed when the music was downloaded, FPM should be deemed to have granted an express license to use the music in question free of charge.[7] Arbogast argues that the "browsewrap" agreement on that website was ineffective.

_____

[7] At some point in late July 2013, FPM created a new website that included an advertisement for "Free Music for YouTube." Doc. #64-1 PageID#1963.

25

The Court disagrees. A browsewrap agreement discloses "terms on a website that offers a product or service" to the user, and the user assents to the terms and conditions by "visiting the website to purchase the product or enroll in the service." *Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 129 n.18 (2d Cir. 2012). A "browsewrap" agreement allows the user "to view the terms of the agreement, but does not require the user to take any affirmative action before the Web site performs its end of the contract." *Doe v. SexSearch*, 502 F. Supp. 2d 719, 729 n.1 (N.D. Ohio 2007).

Courts have found that constructive knowledge alone is sufficient to establish consent to "browsewrap" terms and conditions when the website host placed the notice of the terms and agreements "prominently" and provided "easy access" to the full terms. *Snap-On Bus. Sols., Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669, 682 (N.D. Ohio 2010). *See, e.g.*, *Major v. McCallister*, 302 S.W.3d 227, 230-31 (Mo. Ct. App. 2009) (upholding browsewrap agreement

_____

Arbogast's arguments related to the new website are irrelevant because there is no evidence suggesting that any Arbogast employees accessed the new website before or after the infringing conduct occurred. In the event the new site was accessed, Arbogast would have actual knowledge of the terms and conditions. The newer website required users to select a license type before downloading the music. As opposed to the old website, the new website incorporated a "Clickwrap agreement." A clickwrap agreement is formed when the website visitor is required to explicitly manifest assent to the website's terms and conditions by requiring some affirmative act (*e.g.*, clicking "I agree") before the visitor can proceed further on the website. *Snap-On Bus. Sols., Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669, 681 (N.D. Ohio 2010). A website user's assent is manifested when he or she clicks "I agree" to a proper clickwrap agreement. *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 33-34 (2d Cir. 2002).

where each web page contained "immediately visible notice of the existence of license terms" and hyperlink to those terms); *Ticketmaster Corp. v. Tickets.com*, No. CV99-7654-HLH (VBKx), 2003 U.S. Dist. LEXIS 6483, at *6-7 (C.D. Cal. Mar. 6, 2003) (finding notice of terms posted on home page and visible to most users sufficient to impute knowledge of and assent to those terms).

Arbogast argues that FPM's home page, accessed by his staff at the time the music was downloaded, did not require the user to review the "Terms and Conditions" and gave no warning that a license was required. Arbogast argues that the website was akin to that in *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 22 (2d Cir. 2002). In that case, the court refused to enforce a browsewrap agreement where users of the web page did not see any notice of agreement unless they scrolled down to another screen.

[remainder of page intentionally left blank]

FPM's website is distinguishable from the one at issue in *Specht.* This is what the home page looked like when accessed by Arbogast employees:



Doc. #52-2, PageID#912.

Unlike the browsewrap agreement in *Specht,* FPM's home page displayed a visible link that read: "[t]o learn how you can use Freeplay music click on Terms of Use, Licensing, Rate Card." *Id*. FPM website users did not have to scroll to find the link for the terms of use. The link is easily visible in the upper left-hand corner of the home page. Also, the header of the page included links for licensing and rate cards that are immediately visible when the website is accessed. *Id.* Like the agreement in *Major v. McCallister*, the hyperlink was immediately visible to the

28

user of the website. Clicking on any of these links would have alerted Arbogast that, although personal use of the music was free, business uses required a paid license. Under these circumstances, no reasonable jury could find that FPM had granted Arbogast an express license to use the songs free of charge. Thus, Arbogast was not granted an express license and Arbogast had constructive knowledge of the browsewrap agreement by nature of using the website.

### 2. Implied License

Arbogast also argues that, at a minimum, the Court should recognize an implied license to use the copyrighted works based on the company's name, "Freeplay," and the absence of any conspicuous warning that a business downloading the music was required to purchase a license. The existence of an implied license would bar a finding of copyright infringement. *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998).

Arbogast's argument is easily disposed of. An implied license exists only when: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996); *see also Johnson,* 149 F.3d at 502 ("without intent, there can be no implied license").

Arbogast never asked FPM to create any works. Nor did FPM make any works at Arbogast's request to be used in Arbogast's YouTube videos. Moreover, given FPM's paid license requirements for business use of the copyrighted works

29

available on its website, it cannot be said that FPM intended that Arbogast download and distribute those works free of charge. Accordingly, the Court finds that no implied license exists.

Therefore, there exists no issue of material fact on the subject of express or implied license. Arbogast had neither an express nor implied license to use the music free of charge. Accordingly, FPM will be entitled to summary judgment on the issue of liability for copyright infringement, unless any defense to copyright infringement applies.

### C. Equitable Defenses

Arbogast argues that, even if the Court finds no genuine issue of material fact concerning valid copyright ownership and unauthorized use, FPM's recovery should be barred under the equitable doctrines of unclean hands, copyright misuse, or equitable estoppel. The Court may determine the merits of these equitable defenses as a matter of law. *Malibu Media v. Doe*, No. 13-11432, 2014 U.S. Dist. LEXIS 79889, at *15 (E.D. Mich. June 12, 2014).

### 1. Unclean hands.

Arbogast argues that FPM maintained a "bait and switch" business model that intentionally induced consumers to commit copyright infringement. Arbogast maintains that FPM's business model evidences unclean hands. In the Sixth Circuit, the doctrine of unclean hands allows the court to deny relief where the party applying for the relief is "guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue[.]" *Performance*

30

*Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1383 (6th Cir. 1995). The plaintiff's misconduct "must relate directly to the transaction about which the plaintiff has made a complaint." *Id.*

Arbogast has not presented sufficient evidence that would allow a reasonable trier of fact to find unclean hands through fraud, deceit, unconscionability, or bad faith. Nothing about the old website, which Arbogast used to download the music, demonstrates fraud or the intent to commit fraud. Links to Terms and Conditions, Licensing, and Rate Cards were clearly visible on the website's home page. Given that these links were prominently displayed on the home page, a sophisticated business would not reasonably believe all of the music to be available free of charge. In fact, Schreer maintains that the "free" in "Freeplay" represents the free synchronization fee model and nothing else. Doc. #58, PageID#1875.[8]

Likewise, the website is not intentionally deceptive nor are the terms of the licensing agreement unconscionable. Charging businesses for the use of copyrighted music in advertising would not shock the conscience of any reasonable trier of fact. Nor is there any evidence that FPM acted in bad faith, by tricking

---

[8] As Scott Schreer explained in his deposition, music used in television and video productions generates revenue for the copyright owner through: (1) public performance royalties; and (2) synchronization fees. FPM's business model eliminates synchronization fees and charges businesses only for the performance royalties. Doc. #58, PageID##1874-1876.

businesses to download the music so that it could sue them for copyright violations.[9]

The Court finds that there exists no genuine issue of material fact, and that Arbogast's defense of unclean hands fails as a matter of law.

### 2. Copyright Misuse

Arbogast argues that FPM's business model, paired with the 40 other copyright infringement cases involving FPM, proves copyright misuse. Also, Arbogast alleges that FPM is a "copyright troll" due to its business model and use of TuneSat to "track" its music. Although the Sixth Circuit has not explicitly recognized the doctrine of copyright misuse, other circuits and district courts in the Sixth Circuit have addressed this defense. *Design Basics, LLC v. Petros Homes, Inc.*, 240 F. Supp. 3d 712, 720 (N.D. Ohio 2017) (collecting cases).

Copyright misuse prohibits a copyright holder from using a copyright "to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to grant." *Id.* at 720. To establish copyright misuse, a defendant must establish either "(1) that [the plaintiff] violated the antitrust laws or (2) that [the plaintiff] illegally extended its monopoly beyond the

---

[9] The caselaw relied upon by Arbogast is easily distinguishable. *See Tempo Music v. Myers*, 407 F.2d 503, 506-507 (4th Cir. 1969) (where the plaintiff failed to respond to the defendant's request to clarify what items were protected by copyright before the infringing conduct occurred); *McCormick v. Cohn*, Case No. CV 90-0323 H, 1992 U.S. Dist. LEXIS 21187, at *11 (S.D. Cal. July 31, 1992). (where the plaintiff deliberately misstated the extent of its copyright ownership and failed to comply with discovery requests for information that would directly impact the defense of the infringement claim).

scope of the copyright or violated the public policies underlying the copyright laws." *Microsoft Corp. v. Compusource Distribs., Inc.,* 115 F. Supp. 2d 800, 810 (E.D. Mich. 2000).

FPM's activity does not support a claim of copyright misuse. Copyright law seeks "to promote the dissemination of creative expression, and provide incentives for copyright owners to produce . . . original works." *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1211 (11th Cir. 2001). Where a copyright holder asserts rights in non-copyrightable materials, other individuals may be discouraged from integrating those non-copyrightable materials into their own original creative works. *See generally*, William F. Patry & Richard A. Posner, *Fair Use and Statutory Reform in the Wake of Eldred*, 92 Calif. L. Rev. 1639, 1654-59 (2004).

Arbogast's attempt to compare this case to *Design Basics v. Petros Homes* fails. In *Design Basics,* the plaintiff attempted to allege copyright infringement over design plans that contained elements not protected by the copyright registrations. 240 F. Supp. 3d at 720. The plaintiff also encouraged its employees to track down potential infringements and force settlements. *Id*.

This case is distinguishable because FPM clearly owns the copyright to each song in question and the songs are copyrightable material. FPM is not claiming anything outside the scope of the copyright protection. Moreover, FPM's use of TuneSat does not violate the public policy underlying copyright laws. Unlike the scheme employed by Design Basics, FPM's use of TuneSat raises no concerns that

innovation and creativity will be stifled. TuneSat is simply a tool that can help musicians locate the unauthorized reproduction or publication of copyright protected work that would otherwise be difficult to locate.

This case is further distinguishable from the copyright "troll" line of cases. Copyright trolls are "more focused on the business of litigation than on selling a product or service or licensing their [copyrights] to third parties to sell a product or service." *Malibu Media, LLC v. Doe*, No. 15 Civ. 4369 (AKH), 2015 U.S. Dist. LEXIS 87751, at *4 (S.D.N.Y. July 6, 2015) (quotation omitted). A copyright troll "plays a numbers game in which it targets hundreds or thousands of defendants seeking quick settlements priced just low enough that it is less expensive for the defendant to pay the troll rather than defend the claim." *McDermott v. Monday, LLC*, No. 17cv9230 (DLC), 2018 U.S. Dist. LEXIS 184049, at *5 (S.D.N.Y. Oct. 26, 2018). In *McDermott,* the court held that the use of the term "copyright troll" was appropriate given 500 settlements out of 700 cases filed, "unorthodox" litigation tactics, and frivolous claims. *Id.*

Plaintiffs are deemed to be copyright trolls when they employ "abusive litigation tactics to extract settlements." *Malibu Media, LLC v. Ramsey*, No. 1:14-cv-718, 2015 U.S. Dist. LEXIS 151273, at *9 (S.D. Ohio May 26, 2015). Standing alone, initiating multiple copyright infringement actions and attempting to negotiate settlements does not indicate copyright misuse or copyright trolling. *Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.,* 300 F. Supp. 3d 1356, 1374 (D. Kan. 2018). In one of the many *Malibu Media* cases, the court

34

noted that, "[i]t is certainly true that [the plaintiff] has filed a very large number of infringement suits in this district and in others. But that is what the holders of intellectual property rights do when they are faced with mass infringement." *Malibu Media, LLC v. Doe*, No. 13 C 3648, 2014 U.S. Dist. LEXIS 77929, at *6 (N.D. Ill. June 9, 2014). Although a large number of actions for infringement may be relevant to determination of a plaintiff's status as a copyright troll, volume alone is not dispositive.

Here, the Court finds no evidence that FPM is a copyright troll. FPM has not employed unorthodox litigation tactics or made material misstatements in an effort to intimidate Arbogast. Moreover, although FPM has been a party to 41 similar copyright actions, its efforts to enforce its copyrights are distinguishable from those who have been labeled as copyright trolls. For example, Design Basics initiated over 80 cases on infringement claims that covered unprotected elements of the copyrights in question and the plaintiff in *McDermott* initiated some 700 cases that were described as "unorthodox" or "frivolous." FPM seeks only to protect its copyrighted works from infringement.

Moreover, the evidence does not show that FPM is focused on the business of litigation. FPM is primarily concerned with providing licenses to businesses for the use of its music. In fact, other businesses have been purchasing licenses since 2001 when the company was founded. FPM notes that it has issued over 3.5 million legitimate licenses since July 2013, yet it has filed only a few dozen lawsuits alleging copyright infringement. Doc. #58, PageID#1876. Although FPM

may be aggressive in its protection of legitimate copyrights, the Court finds that FPM is not a copyright troll and has not misused its copyrights.

### 3. Equitable Estoppel

Finally, Arbogast argues that equitable estoppel is an appropriate defense to infringement in this case. Arbogast maintains that FPM, using TuneSat as a tool, set up a bait-and-switch scheme that induced Arbogast into infringing FPM's copyrights.

In order to invoke equitable estoppel, defendants must prove each of the following: "(1) the plaintiff must know the facts of the infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury." *Design Basics, LLC v. Chelsea Lumber Co.*, 977 F. Supp. 2d 714, 736 (E.D. Mich. 2013). "It is also well-settled that a plaintiff may be estopped from asserting his rights under a copyright if he has aided the defendant in infringing or otherwise induced it to infringe or has committed covert acts." *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 753 (E.D. Mich. 1998). "In order to prevail on the defense of equitable estoppel the defendant must have been misled into reasonably and justifiably believing that the plaintiff would not pursue his claims against the defendant." *Encyclopedia Brown Prods. v. Home Box Office*, No. 91 Civ. 4092 (PKL), 1994 U.S. Dist. LEXIS 21372, at *39 (S.D.N.Y. Aug. 24, 1994).

The court finds that equitable estoppel is inapplicable in this case. There is no evidence that Arbogast was reasonably and justifiably mislead into believing that FPM would not pursue a claim for copyright infringement. There is no evidence that FPM intended Arbogast to act on a misleading notion that the music was free to use for business purposes, nor did Arbogast justifiably believe that the music was free to use in business advertisements. In fact, the evidence demonstrates that FPM always intended to require a license for business use. The facts also demonstrate that Arbogast had constructive notice of the terms and conditions of the usage of the music because of the clear and visible browsewrap agreement. Thus, Arbogast's equitable estoppel defense fails as a matter of law.

## IV.    Conclusion

For the reasons set forth above, the Court OVERRULES Defendant's Motion for Summary Judgment or for Referral of Issues to Register of Copyrights, Doc. #52, and SUSTAINS Plaintiff's Motion for Summary Judgment on Liability for Copyright Infringement, Doc. #53.

This leaves for trial only the question of damages. The Court directs the parties to file a joint Amended Rule 26(f) Report no later than **October 23, 2019.** A conference call will be held on **October 30, 2019, at 4:30 p.m.** to set a trial date and other deadlines.

Date: September 24, 2019

WALTER H. RICE
UNITED STATES DISTRICT JUDGE